# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SHAWANDA RENEE OBEY, M.D. | § § | |
| V. | § § | CASE NO. 4:13-CV-656 |
| | § | Judge Mazzant |
| FRISCO MEDICAL CENTER, L.L.P. d/b/a BAYLOR MEDICAL CENTER AT FRISCO, WILLIAM KEATON, Individually and as CEO of Baylor Medical Center at Frisco, DR. JAMES LAFERNEY, Individually and as Vice President of Baylor Medical Center at Frisco, DR. DALE BURLESON, Individually and as Representative of Baylor Medical Center at Frisco Medical Executive Committee, DR. KEITH MATHENY, Individually and as Representative of Baylor Medical Center at Frisco, KAREN MURCHISON, Individually and as Representative of Baylor Medical Center at Frisco, and COLLEEN WOOLDRIDGE, Individually | § § § § § § § § § § § § § § § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants Frisco Medical Center L.L.P. d/b/a Baylor Medical Center at Frisco, William Keaton, Dr. Jimmy Laferney, Dr. Dale Burleson, Dr. Keith Matheny, and Karen Murchison's Notice of Motion and Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Dkt. #53). After reviewing the motion, the responses, and the relevant pleadings, the Court finds the motion should be granted.

## BACKGROUND

Plaintiff, Dr. Shawanda Obey, ("Plaintiff" or "Obey") is an African-American physician licensed to practice medicine in the State of Texas and the State of Ohio (Dkt. #35 at 4, ¶ 13). In 2004, Plaintiff moved to the Plano/Frisco, Texas area to begin her medical practice. *Id.* at ¶ 14.

1

On July 16, 2008, Plaintiff was appointed to the Provisional Staff category of the Medical Staff at Defendant Frisco Medical Center, L.L.P. d/b/a Baylor Medical Center at Frisco ("Baylor Medical"), and was granted clinical privileges pursuant to her written application and Baylor Medical's Medical Staff Bylaws (Dkt. #35 at ¶ 20; Dkt. #54 at ¶¶ 9 and 11, Exs. C and F). Between September 18, 2012 and November 18, 2012, Baylor Medical received five separate incident reports concerning Plaintiff's behavior, including:

- On September 18, 2012, when Plaintiff was informed by one of Baylor Medical's labor and delivery nurses that her scheduled cesarean would be delayed because of an emergency cesarean section, Plaintiff "became hostile and stated she needed to 'get home and take care of her 3 month old twins so that was not a priority and she would have to do it tomorrow." When told that the next day's schedule was full, Plaintiff "'stormed off' stating that 'she can't just have her babies in the street.'" When the nurse tried to further explain, Plaintiff ignored her.

- On September 28, 2012, Plaintiff was informed by a different labor and delivery nurse that one of her patients was not scheduled for a cesarean section the week Plaintiff thought she was. Plaintiff responded that she "'didn't know what kind of games you all are playing up there with just certain doctors but I don't appreciate it.'" When told that she could schedule the cesarean section for 1500 or 1700 on the day requested, Plaintiff yelled at the nurse that "'she has her own babies to take care of' and she would not be doing a cesarean section at 1700."

- On September 30, 2012, one of the labor and delivery nurses paged Plaintiff to request orders for Plaintiff's patient. Plaintiff told the nurse "'to just keep the patient until the morning and I'll check her and don't call me.'" When the nurse explained that she would have to call Plaintiff if something happened, Plaintiff told the nurse that she was "'tired of you people'" and that "'you people are being ridiculous.'"

- On November 14, 2012, after being handed a chart by the labor and delivery unit secretary who had been checking it, Plaintiff threw the chart on the counter towards the secretary and stated "'I was looking for my chart for the past 10 minutes, I don't like this hospital, this is the kind of hospital that needs to be shut down.'"

- On November 18, 2012, one of the labor and delivery nurses called Plaintiff to report on the status of one of Plaintiff's patients and was told by Plaintiff that the patient "'better be 7 cm when I get there because I

> have 2 babies and I have things to do.'" Plaintiff then asked to speak with her patient and proceeded to ask the patient if her patient's mother could watch Plaintiff's children during the patient's delivery. Upon arriving at the hospital, Plaintiff reportedly took her lunch into the patient's room and ate it while the patient was actively laboring. Also, during and after the delivery, Plaintiff was heard making disparaging remarks about Baylor Medical to the patient and her family.

(Dkt. #55 at ¶¶ 6 and 11, Exs. CC and FF; Dkt. #58 at ¶¶ 8, Exs. NN). Concerned by the high number of incident reports, Baylor Medical's Chief Executive Officer, William Keaton ("Keaton"), and Baylor Medical's Vice President of Medical Affairs, Jimmy Laferney, M.D. ("Laferney"), met with Plaintiff on November 27, 2012, to discuss the complaints that were made against Plaintiff (Dkt. #55 at ¶¶ 8-9, Ex. DD; Dkt. #56 at ¶ 3). During that meeting, Plaintiff was informed that an investigation concerning her suspected violation of Baylor Medical's Code of Conduct was being conducted pursuant to Baylor Medical's Code of Conduct and Disruptive Behavior Policy, and advised her of her right to submit a written statement explaining her actions to be considered in the investigation (Dkt. #55 at ¶¶ 8-9, Ex. DD). Plaintiff submitted her response on December 12, 2012. *Id*. at ¶ 10, Ex. EE.

On January 16, 2013, Plaintiff was advised that the Baylor Medical Executive Committee ("MEC") had considered the results of the investigation conducted, and that due to concerns that Plaintiff may have "exhibited acts, demeanor, or conduct which are reasonably considered to be lower than the standards of the Medical Staff, contrary to Medical Staff Bylaws, Rules and Regulations, or policies, or below applicable professional standards, the MEC appointed an Ad Hoc Committee to conduct further investigation of the reported incidents," which investigation was to be conducted pursuant to Section 6.1-3 of the Medical Staff Bylaws (Dkt. #57 at ¶ 11, Ex. KK).

On March 7, 2013, the Ad Hoc Committee met with Plaintiff, and on March 11, 2013, issued its investigation report to the MEC (Dkt. #58 at ¶¶ 7-8, Exs. MM and NN). The Ad Hoc Committee concluded that Plaintiff "engaged in a pattern of behavior which is reasonably considered to be lower than the standards of the Medical Staff, contrary to the Code of Conduct, and below applicable professional standards" (Dkt. #58, Ex. NN). The Committee questioned Plaintiff's "awareness of her professionalism and the effect of her actions and statements toward L&D nurses," and noted that Plaintiff did not "appear to understand the importance of maintaining professional conduct." *Id*. The Committee stated, "It appears to this Committee that when individuals criticize her, the only conceivable explanation in Dr. Obey's mind is that such individuals are attempting to undermine her…" and overall observed that Plaintiff "appears to exhibit an underlying paranoia and inability to see situations from another's perspective." *Id*. The Committee recommended that Plaintiff undergo a psychiatric evaluation. *Id*. On March 12, 2013, the MEC met to review the results and recommendations of the Committee, voted to require Plaintiff to undergo a psychiatric assessment and evaluation within sixty (60) days of notice, closed its investigation, and notified Plaintiff of the results on March 15, 2013 (Dkt. #57 at ¶¶ 12-15, Ex. LL). Plaintiff chose not to complete the evaluation, and voluntarily resigned on May 15, 2013 (Dkt. #54 at ¶ 13, Ex. J; Dkt. #57 at ¶ 16).

On November 11, 2013, Plaintiff filed her complaint in this Court against Defendants (Dkt. #1). On August 11, 2014, Plaintiff filed her second amended complaint against Defendants, alleging causes of action for race discrimination and retaliation arising under 42 U.S.C. § 1981, racial harassment/hostile work environment and retaliation arising under 42 U.S.C. § 1981, tortious interference with existing contracts, defamation, and declaratory relief (Dkt. #35). In her second amended complaint, Plaintiff alleges that in general doctors, hospitals,

and nurses in Frisco, Texas were hostile to her because of her race. *Id*. Plaintiff contends that between July 2008 and August 2010, she was forced to endure numerous instances of defamation and sham peer reviews by staff at Baylor Medical and other hospitals. *Id*. at ¶ 25. Plaintiff alleges that she was peer reviewed for normal events in the course of a labor and delivery that other non-black doctors were not peer reviewed for. *Id*. at ¶ 27. Plaintiff contends that she informed Keaton and Laferney about the defamation and toxic work environment she was experiencing as a result of her race. *Id*. at ¶ 32. Plaintiff asserts that on April 3, 2013, she entered a Physician Employment Agreement as an OB/GYN surgeon with Good Shepherd Medical Center in Oregon ("Good Shepherd"), and expected to begin work there on June 1, 2013. *Id*. at ¶¶ 42-43. Plaintiff alleges that Baylor Medical did everything possible to impede Plaintiff's credentialing process and employment with Good Shepherd, such as refusing to provide the Oregon Medical Board or Good Shepherd the information needed to license Plaintiff in Oregon. *Id*. at ¶ 43. Plaintiff also contends that Defendants have prevented Plaintiff from obtaining licensure in the State of Minnesota by refusing to send verification that she had privileges with Baylor Medical. *Id*. at ¶ 45.

On October 17, 2014, Defendants Frisco Medical Center L.L.P. d/b/a Baylor Medical Center at Frisco, William Keaton, Dr. Jimmy Laferney, Dr. Dale Burleson, Dr. Keith Matheny, and Karen Murchison filed their Notice of Motion and Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Dkt. #53-59). On November 25, 2014, Plaintiff filed her response (Dkt. #77). On December 12, 2014, Defendants filed their reply and objections to Plaintiff's evidence (Dkt. #84).

Also on November 25, 2014, Plaintiff filed her objections to Defendants' motion for summary judgment evidence (Dkt. #78). On December 12, 2014, Defendants filed their response (Dkt. #82).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson,* 477 U.S. at 248.

The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News*, *Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for

summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. No "mere denial of material facts nor . . . unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Computer Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004). Rather, the Court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The Court must consider all of the evidence but must refrain from making any credibility determinations or from weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS[1]

*Defendants' Objections to the Affidavit of Plaintiff Shawanda Renee Obey Filed in Opposition to Defendants' Motion for Summary Judgment or, In the Alternative, Partial Summary Judgment (Dkt. #84-2)*

Defendant objects to many statements made in the affidavit of Plaintiff, attached to Plaintiff's response as exhibit B (*See* Dkt. #77-3).

Defendants' objection one is sustained. The Court agrees that this statement is inadmissible hearsay, not subject to any exception to the hearsay rule. Paragraph 2 beginning with the second sentence is stricken from the summary judgment record.

---

[1] Plaintiff objects to exhibits OO and QQ, attached to the affidavit of Jee-Young Kim (Dkt. #78; Dkt. #59 at Ex. OO and QQ). Plaintiff objects to these documents on the basis that they are printouts from a website and are inadmissible hearsay and unreliable evidence. Plaintiff's objection to exhibit OO is overruled, as this is not a printout from a website, and is a copy of the September 21, 2010 Order granting an agreed motion for dismissal with prejudice in the 366th District Court of Collin County (Dkt. #59 at Ex. OO). Plaintiff has presented no reason why this document should not be admitted, and the Court has authority to take judicial notice of these court records. *See R2 Invs. LDC v. Phillips*, 401 F.3d 638, 639 n.2 (5th Cir. 2005).
Assuming that Plaintiff meant to object to exhibits QQ and PP, the Court also finds that Plaintiff's objections are overruled. Defendants assert, and the Court agrees, that this evidence is not being offered to prove the truth of the matter asserted in the patient reviews, but instead to show consumer perceptions of the services offered by Plaintiff. The Court finds that Plaintiff's objections are overruled.

7

Defendants' objection two is sustained. The Court agrees that the attitudes of nurses and doctors at Medical Center of Plano, a hospital that is not a defendant in this litigation, are not relevant to a determination of Plaintiff's causes of action arising in this case against these unrelated Defendants. Paragraph 3 is stricken from the summary judgment record.

Defendants' objection three is sustained in part. The Court agrees that the attitudes of nurses and doctors at Texas Health Presbyterian Hospital Plano, a hospital that is not a defendant in this litigation, are not relevant to a determination of Plaintiff's causes of action arising in this case against these unrelated Defendants. Paragraph 4 beginning with the second sentence is stricken from the summary judgment record.

Defendants' objection four is overruled.

Defendants' objection five is sustained in part. The Court agrees that the actions of nurses and doctors at Texas Health Presbyterian Hospital Plano and Medical Center of Plano, a hospital that is not a defendant in this litigation, are not relevant to a determination of Plaintiff's causes of action arising in this case against these unrelated Defendants. In addition, some of the statements made are inadmissible hearsay. Paragraph 6 beginning with the second sentence is stricken from the summary judgment record.

Defendants' objection six is overruled.

Defendants' objection seven is sustained. The Court agrees that this paragraph contains improper legal conclusions that are not appropriate summary judgment evidence, but rather, are more appropriate for argument of counsel. Paragraph 8 is stricken from the summary judgment record.

Defendants' objection eight is overruled.

Defendants' objection nine is sustained. The Court agrees that the actions of nurses and doctors at Texas Health Presbyterian Hospital Plano, a hospital that is not a defendant in this litigation, are not relevant to a determination of Plaintiff's causes of action arising in this case against these unrelated Defendants. In addition, some of the statements made are inadmissible hearsay. Paragraph 10 is stricken from the summary judgment record.

Defendants' objections ten, eleven, twelve, and thirteen are overruled.

Defendants' objection fourteen is sustained. The Court agrees that some of the statements made are inadmissible hearsay. The first and last sentences of paragraph 16 are stricken from the summary judgment record.

Defendants' objections fifteen, sixteen, seventeen, eighteen, nineteen, twenty, twenty-one, twenty-two, and twenty-three are overruled.

Defendants' objection twenty-four is sustained in part. The Court agrees that the statements made by Colleen Wooldridge are inadmissible hearsay. The sentence beginning, "Specifically, Ms. Wooldridge told S.H…." and the next two sentences of paragraph 27 are stricken from the summary judgment record.

Defendants' objections twenty-five, twenty-six, twenty-seven, twenty-eight, twenty-nine, thirty, thirty-one, and thirty-two are overruled.

*Defendants' Notice of Motion and Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Dkt. #53)*

Defendants first move for summary judgment on Plaintiff's claims for race discrimination, retaliation, hostile work environment, and harassment arising under 42 U.S.C. § 1981. Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts… as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Under this statute, the phrase "make and enforce

contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

"Claims of racial discrimination brought under this statute are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII." *Van v. Anderson*, 199 F. Supp. 2d 550, 562 (N.D. Tex. 2002); *see also Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997). "Claims of discrimination brought under Title VII and § 1981 require the same proof to establish liability." *Pisharodi v. Valley Baptist Med. Ctr.*, 393 F. Supp. 2d 561, 575 (S.D. Tex. 2005) (quoting *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 901 (E.D. Tex. 2004)). Thus, in order to state a claim under Section 1981, a plaintiff must prove that "(1) he [or she] is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned the 'making and enforcing' of a contract." *Van*, 199 F. Supp. 2d at 562; *see also Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 260-61 (5th Cir. 2007).

Defendants first assert that no contractual relationship existed with Plaintiff. Plaintiff contends that the medical staff bylaws formed a binding contract (Dkt. #77 at 6).

Under Texas law, medical staff bylaws do not create a contractual relationship between a doctor and the hospital. *See Stephan v. Baylor Medical Center at Garland*, 20 S.W.3d 880, 888 (Tex. App. – Dallas, 2000, no pet.) ("Bylaws that do not define or limit the power of a hospital as it acts through its governing board do not create contractual relationships for the hospital."); *Monroe v. AMI Hosps. of Tex., Inc.*, 877 F. Supp. 1022, 1029 n.5 (S.D. Tex. 1994) ("This court notes, however, that under Texas law, a hospital's medical staff bylaws do not constitute a contract between the hospital and its medical staff members."); *Van*, 199 F. Supp. 2d at 562-64

(dismissing physician's Section 1981 claim because "it is generally understood that rights promulgated by *medical staff bylaws* are considered incapable of creating an enforceable contract between the hospital and its physicians," and "in the absence of a contract with the Defendant Hospital, Plaintiff has failed to satisfy a necessary element for maintaining his Section 1981 action." (emphasis in original)); *Johnson v. Christus Spohn*, No. C-06-138, 2008 WL 375417, at *64 n.90 (S.D. Tex. Feb. 8, 2008), *aff'd by* 334 F. App'x 673 (5th Cir. 2009) ("Courts in the Fifth Circuit consistently find that *medical staff bylaws* do not create a contract between a hospital and a doctor and thus do not give rise to contractual rights of contract-based causes of action." (emphasis in original)).

Plaintiff does not dispute that her privileges were granted pursuant to Baylor Medical's Medical Staff Bylaws. However, the cases cited by Plaintiff in support of her argument that medical staff bylaws can, in some circumstances, create a binding contract do not support her position. In *Weary v. Baylor Univ. Hosp.*, 360 S.W.2d 895 (Tex. App. – Waco 1962, writ ref'd n.r.e.), the court found that plaintiff failed to establish a viable cause of action for breach of contract against a defendant hospital because the medical staff bylaws did not create a contractual relationship between the doctor and hospital, since the bylaws in no way limited the power of the Governing Board of the Hospital to appoint or reappoint a doctor. *Id.* at 897. In *Munoz v. Flower Hosp.*, 507 N.E.2d 360 (Ohio Ct. App. 1985), the court, applying Ohio law, found that a defendant hospital was not bound by medical staff bylaws and that no contractual relationship arose from the bylaws. *Id.* at 365 (the court found staff bylaws could be binding only where intent to be bound can be found within the bylaws). In the present case, it is clear that there is no contractual relationship between Plaintiff and Defendants, since the medical staff

bylaws do not demonstrate and intent to be bound and Plaintiff alleges no other contract sufficient to satisfy the requirements of Section 1981.

Plaintiff also alleges that Defendants violated Section 1981 based on their alleged interference with her third-party contracts with her patients and potential employers in other states. In *Felton v. Polles*, 315 F.3d 470 (5th Cir. 2002), the Fifth Circuit expressly declined to rule on the question of whether a plaintiff has a cause of action under Section 1981 against a third-party for interference with a plaintiff's right to make and enforce contracts. *Id*. at 480-81, *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). However, the Fifth Circuit did suggest that the answer to this question should be "no" unless the defendant is "essentially the same" as, or acting on behalf of, the party to the complained-of contract. *Id*.; *see also James v. Parish*, 421 F. App'x 469, 470 (5th Cir. 2011) (holding that plaintiff did not have a valid Section 1981 claim where plaintiff alleged that his employer's failure to verify his lost wages unconstitutionally interfered with his ability to obtain personal injury benefits pursuant to an insurance contract because "[the Fifth Circuit] ha[s] suggested that a plaintiff does not have a cause of action under section 1981 against a third party for interference with the plaintiff's right to make and enforce contracts."). In the present case, it is undisputed that Defendants are not "essentially the same" as, or acting on behalf of, Plaintiff's patients or potential future employers, and, thus, Plaintiff cannot prove a Section 1981 claim against Defendants for interference with third-party contracts.

Defendants also assert that Plaintiff's claims under Section 1981 fail because Plaintiff has no evidence to show an intent by Defendants to discriminate on the basis of race. Plaintiff "may establish a prima facie case by direct or, more commonly, circumstantial evidence of discriminatory motive." *Johnson,* 2008 WL 375417, at *15. "Direct evidence of discrimination

is evidence that proves the defendant acted with discriminatory intent, without the need for inference or presumption." *Van*, 199 F. Supp. 2d at 566. Plaintiff has no direct evidence that proves Defendant acted with discriminatory intent. "If direct evidence is unavailable, as is typically the case, a prima facie case is established by proving: (1) that the plaintiff is a member of a protected class; (2) that [s]he was at all times qualified for the position at issue; and (3) that the defendant made an adverse employment decision despite the plaintiff's qualifications." *Id*. It appears from a review of the summary judgment record that Defendant made no adverse employment decision regarding Plaintiff. In fact, Plaintiff was never employed by Baylor Medical, never received compensation from Baylor Medical, and did not receive benefits from Baylor Medical. Plaintiff enjoyed medical staff privileges, which allowed her to use Baylor Medical's resources and facilities to treat her patients. However, Defendants did not revoke or alter her privileges in any way, even following their investigation. Plaintiff contends that she was constructively discharged from her position at Baylor Medical because the working environment was so intolerable that a reasonable person would feel compelled to resign (Dkt. #77 at 9). However, again, Plaintiff was never employed by Baylor Medical and has no evidence that a reasonable person would have felt compelled to resign. Accordingly, the Court finds that Plaintiff cannot satisfy her burden to establish a prima facie case under Section 1981, and, for this additional reason, finds Plaintiff's claims should be dismissed.[2]

Defendants also move for summary judgment on Plaintiff's claims for intentional interference with Plaintiff's patient contracts, her employment contract with Good Shepherd, and her contract with CompHealth, on the basis that Defendants are immune from liability for these

---

[2] Plaintiff also alleges that Defendants' reasons for their employment decision were merely pretext for discrimination. However, since the Court has found that Plaintiff cannot establish a prima facie case, there is no need for the Court to consider whether Defendants have a legitimate, nondiscriminatory reason for their decision, and whether that rationale is merely pretextual. *Van*, 199 F. Supp. 2d at 566.

claims under the Health Care Quality Improvement Act ("HCQIA") and the Texas Health Care Quality Improvement Act ("THCQIA").

HCQIA was enacted to prevent malpractice, to improve the quality of health care, and to ensure that incompetent physicians are prevented from "mov[ing] from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101; *Poliner v. Texas Health Sys.*, 537 F.3d 368, 376 (5th Cir. 2008). Congress noted that peer review was an important part of remedying these problems, "but recognized that lawsuits for money damages dampened the willingness of people to participate in peer review." *Poliner*, 537 F.3d at 376. "Accordingly, Congress 'grant[ed] limited immunity from suits for money damages to participants in professional peer review actions.'" *Id.* When a "professional review action" meets certain standards, the HCQIA provides that participants in the peer review "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action." *See id.*; 42 U.S.C. § 11111(a)(1).

A "professional review action" is defined in part as "an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician." 42 U.S.C. § 11151(9). Under the facts of this case, it is undisputed that a professional review action was taken against Plaintiff when Defendants investigated the complaints made against Plaintiff and recommended a psychiatric evaluation. Accordingly, in order for Defendants to be entitled to immunity, the professional review action must be taken under the following conditions:

> (1) in the reasonable belief that the action was in the furtherance of quality health care;
>
> (2) after a reasonable effort to obtain the facts of the matter;
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a); *Poliner*, 537 F.3d at 376-77. "The Act includes a presumption that a professional review [action] meets the standards for immunity, 'unless the presumption is rebutted by a preponderance of the evidence.'" *Poliner*, 537 F.3d at 377.

The Court will first turn to the reasonable belief standard, which is satisfied if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Id*. This is an objective inquiry in which the Court considers the totality of the circumstances. *Id*. Plaintiff contends that it was unreasonable for Defendants to require her to undergo a psychiatric evaluation. Plaintiff asserts that (1) none of the nurses' complaints involved conduct which affected or could affect adversely the health or welfare of a patient, (2) that there were significant discrepancies and contradictions in the information collected, (3) that the nurses' statements were embellished and were for the purpose of sabotage, (4) that the Committee relied on statements from nurses with a bias against Plaintiff, and (5) that Plaintiff had a reasonable explanation for her actions.

First, Defendants are entitled to a presumption that the professional review action meets the standards for immunity, unless the presumption is rebutted by the preponderance of the evidence. *Id*. Plaintiff has no evidence to support her arguments, other than the allegations

made in her affidavit that she believed the nurses were attempting to sabotage her and that Baylor Medical was hostile to her on the basis of her race.

Second, the Fifth Circuit has held that "quality patient care demands that doctors possess at least a reasonable 'ability to work with others.'" *Everhart v. Jefferson Parish Hosp. Dist. No. 2*, 757 F.2d 1567, 1572-73 (5th Cir. 1985) (finding no substantive due process violation where physician was denied staff membership based on his interpersonal problems at previous hospitals because the ability to get along with others is "reasonably related to the provision of adequate medical care" and an inability to work with hospital staff "endanger[s] the hospital's ability to provide quality medical care"); *see also Johnson,* 2008 WL 375417, at *7 (citing *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 469 (6th Cir. 2003) (finding that "quality health care" is not "limited to clinical competence, but includes matters of general behavior and ethical conduct.")). The professional action taken by Defendants was the direct result of several complaints by nurses that Plaintiff was acting unprofessionally towards them and in her interactions with patients. Plaintiff's attempt to characterize these interactions as "personality conflicts" does not defeat the fact that Defendants undertook a professional review of Plaintiff's conduct in furtherance of quality health care. All Defendants must show is that "with the information available to them at the time of the professional review action," they "would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Poliner*, 537 F.3d at 377. Plaintiff has not satisfied her burden to rebut the presumption afforded Defendants, nor to demonstrate that the action taken by Defendants was not in furtherance of quality health care.

Plaintiff next asserts that Defendants did not engage in reasonable fact gathering because they did not obtain the relevant, unbiased facts. However, the undisputed evidence in this case

demonstrates that the Committee reviewed the complaints sent by the nurses and allowed Plaintiff to submit a rebuttal statement regarding the incidents in question. Then, after determining further evidence was necessary, the Committee interviewed Plaintiff prior to making their recommendation that she obtain a psychiatric evaluation. "The HCQIA does not require the ultimate decisionmaker to investigate a matter independently, but requires only a 'reasonable effort to obtain' the facts." *Poliner*, 537 F.3d at 380. Defendants' investigation was clearly a reasonable effort to obtain the facts in this case, as it included interviews with nine different nurses from different floors of the labor and delivery unit, with different management and administrative roles, and from different shifts (Dkt. #55 at ¶¶ 6 and 8, Ex. CC). Further, the Committee considered the written statement of Plaintiff, as well as an oral interview, prior to making their decision.

Plaintiff next argues that she was not provided with adequate notice and a hearing. Plaintiff contends that she was entitled to a hearing following the Committee's decision to require her to participate in an involuntary psychiatric assessment. Plaintiff states that, pursuant to Baylor Medical's bylaws, the following "shall constitute grounds for a hearing based upon reason related to professional competence or conduct:

…

(l) involuntary imposition of consultation or monitoring requirements."

(Dkt. #77 at 15 (citing Dkt. #54, Ex. A)). Plaintiff was notified at the outset of the investigation that the Ad Hoc Committee's investigation was going to be conducted pursuant to Section 6.1-3 of the medical staff bylaws, which states that a member of the Medical Staff subject to an investigation "may be notified that an investigation is being conducted and may be given an opportunity to provide information in a manner and upon such terms as the individual or

17

investigating body deems appropriate" (Dkt. #55 at ¶ 6, Ex. A at 28 at ¶ 6.1-3; Dkt. #57 at ¶ 11). Further, Plaintiff agrees that she was given notice at every stage of the investigation and was given an opportunity to respond, which she did (Dkt. #35, ¶¶ 30, 33, 36-37). Finally, Plaintiff contends that the involuntary imposition of a consultation with a psychiatrist entitled her to a hearing under the bylaws. However, the medical staff bylaws define "consultations" as patient care activities (Dkt. #55 at ¶ 6, Ex. A at 12 at ¶ 3.2-2 ("Patient care activities may include, but are not limited to, admissions, assisting at surgeries, and consultations.")). In addition, Defendants note that in the patient care context, a "consultation" is a "deliberation between physicians on a case or its treatment" or the "meeting of two or more physicians or surgeons to evaluate the nature and progress of disease in a particular patient and to establish diagnosis, prognosis, and therapy" (Dkt. #84 at 10 (citing *Merriam-Webster's Medical Dictionary* 180 (2006); *Stedman's Medical Dictionary* 435 (2006)). Using this definition of consultation, Plaintiff was not entitled to a hearing under the medical staff bylaws.

Finally, Plaintiff contends that the action was not taken in the reasonable belief that the action was warranted by the facts known after the conclusion of the investigation. Plaintiff again has no evidence that the action was not taken in a reasonable belief that the action was warranted by the facts known at the conclusion of the investigation. Plaintiff merely makes the same arguments as stated above, which are not sufficient to show that the action was not taken in a reasonable belief that it was warranted. Thus, the Court concludes that Plaintiff's claims for tortious interference with patient and employment contracts are barred by immunity under HCQIA.

In addition, the THCQIA establishes civil liability for the following:

(1) a person who, in good faith, reports or furnishes information to a medical peer review committee or the board;

(2) a member, employee, or agent of the board, a medical peer review committee, or a medical organization committee, or a medical organization district or local intervenor, who takes an action or makes a recommendation within the scope of the functions of the board, committee, or intervenor program, if that member, employee, agent, or intervenor acts without malice and in the reasonable belief that the action or recommendation is warranted by the facts known to that person; and

(3) a member or employee of the board or any person who assists the board in carrying out its duties or functions provided by law.

TEX. OCC. CODE § 160.010(a)(1)-(3). Under THCQIA, "[c]ourts apply a presumption that medical peer review actions are taken without malice." *Johnson*, 2008 WL 375417, at *14; *see also Monroe*, 877 F. Supp. at 1030-31 ("Under Texas law, a presumption of absence of malice applies to medical peer review committee actions… [b]ecause there is a presumption of absence of malice, the plaintiff must show specific and sufficient evidence of malice."). Plaintiff cannot show evidence that Defendants acted with malice, much less present sufficient evidence to rebut the presumption that Defendants' actions were taken without malice. Thus, the Court finds that Plaintiff's claims for tortious interference with patient and employment contracts are barred by immunity under TCHQIA.

Finally, Plaintiff agrees that her request for declaratory relief should be withdrawn. Accordingly, the Court finds that Defendants' motion for summary judgment is granted, and Plaintiff's claims are dismissed with prejudice in their entirety.

## CONCLUSION

Based on the foregoing, the Court finds that Defendants Frisco Medical Center L.L.P. d/b/a Baylor Medical Center at Frisco, William Keaton, Dr. Jimmy Laferney, Dr. Dale Burleson, Dr. Keith Matheny, and Karen Murchison's Notice of Motion and Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Dkt. #53) is hereby **GRANTED**, and Plaintiff's claims are **DISMISSED** with prejudice.

**SIGNED this 30th day of January, 2015.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE